## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **WENDY REYES** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil No. **20-3565 PJM** |
| | * | |
| **BOARD OF EDUCATION FOR PRINCE** | * | |
| **GEORGE'S COUNTY PUBLIC** | * | |
| **SCHOOLS,** *et al.*, | * | |
| | * | |
| Defendants. | * | |

## MEMORANDUM OPINION

In this Individuals with Disabilities Education Act (IDEA) case pursuant to 20 U.S.C. § 1400, *et seq*. Plaintiff Wendy Reyes, parent of a minor daughter A.C., challenges the decision of an Administrative Law Judge (ALJ) in a Due Process hearing to the extent that the ALJ held in favor of the Prince George's County Public Schools (PGCPS) system. Defendants are PGCPS; the Board of Education of PGCPS; Monica Goldson, Chief Executive Officer of PGCPS; and Trinell Bowman, Associate Superintendent for Special Education for PGCPS. *See* ECF No. 1.[1] Plaintiff appeals the ALJ's conclusion that PGCPS did not fail to make an appropriate placement of services for A.C. from March 2018 through June 2020; did not fail to provide an appropriate placement of future services for A.C. in March 2020; did not fail to implement certain Individualized Education Programs (IEPs); and did not fail to provide accurate quarterly IEP reports. She also appeals the issue of whether the lack of direct occupational therapy services in certain of A.C.'s IEPs was inappropriate – on which the ALJ did not rule. The ALJ, however, ruled in favor of Plaintiff on her claim that PGCPS failed to provide appropriate other services in connection with certain of A.C.'s IEPs and her claim that PCGPS failed to convene certain IEP meetings to review and revise

---

[1] PGCPS is the principal Defendant.

IEPs after A.C. failed to make sufficient progress. Plaintiff, for the most part, is satisfied with the ALJ's findings of fact and conclusions that favored her and asks that the ALJ's decision be affirmed as to those claims. Defendants would have the Court sustain the ALJ in every respect.

Plaintiff and Defendants have filed cross-motions for summary judgment. *See* ECF Nos. 26 and 32.  No hearing is necessary to resolve the motions. *See* Loc. R. 105.6 (D. Md. 2021). For the reasons that follow, the Court AFFIRMS the decision of the ALJ in all but two respects: The Court provides remedies for PGCPS's failure to convene certain IEP meetings for the benefit of A.C., and for its failure to include direct occupational therapy (OT) services for A.C. in the 2019 IEP. Accordingly, Plaintiff's Motion for Summary Judgment (ECF No. 26) will be DENIED IN PART and GRANTED IN PART, and PGCPS' Cross-Motion for Summary Judgment (ECF No. 32) will correspondingly be DENIED IN PART and GRANTED IN PART.

## I.      STATUTORY BACKGROUND

Under the IDEA, children with disabilities between the ages of three and twenty-one are entitled to a free appropriate public education, commonly referred to as a "FAPE." 20 U.S.C. § 1412(a)(1)(A). "Maryland also has regulations governing the provisions of FAPEs to children with disabilities in accordance with the IDEA." *M.C. v. Starr*, No. DKC–13–3617, 2014 WL 7404576, at *1 (D. Md. Dec. 29, 2014) (citing Md. Code Regs. Tit. 13A, § 05.01). "A FAPE is an education that provides 'meaningful access to the educational process' in 'the least restrictive environment' and is 'reasonably calculated to confer some educational benefit' on the child with the disability." *Id. quoting Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 192, 207, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982).

"A school provides a FAPE by developing an [Individualized Education Program ("IEP")] for each disabled child." *J.P. ex rel. Peterson v. Cty. Sch. Bd. of Hanover Cty., Va.*, 516 F.3d 254,

257 (4th Cir. 2008). "An appropriate IEP must contain statements concerning a disabled child's level of functioning, set forth measurable annual achievement goals, describe the services to be provided, and establish objective criteria for evaluating the child's progress." *MM ex rel. DM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 527 (4th Cir. 2002) (citing 20 U.S.C. § 1414(d)(1)(A)). An IEP is "prepared by an IEP Team, which consists of a representative of the school district, the child's teacher[s], the parents or guardian, and where appropriate, the child [him-or] herself." *Id.* (citing 20 U.S.C. § 1414(d)(1)(B)). "To meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999, 197 L. Ed. 2d 335 (2017). While a FAPE must provide a benefit that amounts to "more than trivial progress," this does not require that a school district provide a disabled child with the "best possible education," or that the education "maximize" each disabled child's "potential." *M.C.,* 2014 WL 7404576, at *1 (citing 458 U.S. at 192; *Hartmann by Hartmann v. Loudoun Cty. Bd. of Educ.*, 118 F.3d 996, 1001 (4th Cir. 1997)).

The IDEA "establishes a series of elaborate procedural safeguards 'designed to ensure that the parents or guardian of a child with a disability are both notified of a decision affecting their child and given an opportunity to object to these decisions.'" *MM ex rel. DM*, 303 F.3d at 527 (*quoting Gadsby v. Grasmick*, 109 F.3d 940, 956 (4th Cir.1997)). The IDEA, for example, "requires that the parents or guardian of a disabled child be notified by the school district of any proposed change to their child's IEP." *Id.* (citing 20 U.S.C. § 1415(b)). In Maryland, parents have the right to "voice disagreement with their children's proposed IEPs and request due process hearings before the Maryland Office of Administrative Hearings [OAH] to address their concerns." *M.L. ex rel.*

*Leiman v. Starr*, 121 F. Supp. 3d 466, 470 (D. Md. 2015), *aff'd sub nom. M.L. by Leiman v. Smith*, 867 F.3d 487 (4th Cir. 2017) (internal citations and quotations omitted).

Following the administrative due process hearing before the ALJ, an aggrieved party, be it the parent or the school district, may appeal the ALJ's decision to the United States District Court. *See* 20 U.S.C. § 1415(i)(2)-(3).

## II.    STANDARD OF REVIEW

In considering motions for summary judgment in an IDEA case, the "reviewing court is obliged to conduct a modified *de novo* review of the administrative record, giving due weight to the underlying administrative proceedings." *M.L. ex rel. Leiman*, 121 F. Supp. 3d at 474 (*citing M.C.*, 2014 WL 7404576, at *6) (internal quotations omitted). This standard means that a reviewing court must consider an ALJ's findings of fact "*prima facie* correct" when they are made "in a regular manner and with evidentiary support." *Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991). If a district court "is not going to follow them, [it] is required to explain why it does not." *Id.*   In determining whether such factual findings were "regularly made," a reviewing court "should examine the way in which the state administrative authorities have arrived at their administrative decisions and the methods employed." *Id.* A reviewing court should hesitate to disturb the "ALJ's determinations of the credibility of witnesses" since "the fact-finder, who has the advantage of hearing the witnesses, is in the best position to assess credibility." *Wagner v. Bd. of Educ. of Montgomery Cty., Maryland*, 340 F. Supp. 2d 603, 611 (D. Md. 2004) (quotation omitted).

"The [c]ourt then reaches its decision based on the preponderance of the evidence." *M.L. ex rel. Leiman*, 121 F. Supp. 3d at 474 (*citing Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 192, 207, 102 S. Ct. 3034, 73 L. Ed. 2d 690 (1982)). In

IDEA cases in which plaintiffs are appealing the administrative decision, plaintiffs "face an uphill battle for several reasons," not only because they must bear the burden of proof with respect to the evidence both in the administrative hearing and on appeal, but also because deference is owed to the administrative proceedings. *Wagner*, 340 F. Supp. 2d at 611. In weighing the evidence before it, the reviewing court must not "substitute [its] own notions of sound educational policy for those of local school authorities." *M.C.*, 2014 WL 7404576, at *6 (internal citations and quotations omitted).

"A motion for summary judgment in an IDEA case . . . 'may be more aptly described . . . as a motion for summary adjudication, wherein the district court is required to conduct a *de novo* review of the administrative record while giving 'due weight' to the administrative findings made below.'" *Alexis v. Board of Educ. for Baltimore County Public Schools*, 286 F.Supp.2d 551, 556 (D. Md. 2003), *quoting Hanson ex rel. Hanson v. Smith*, 212 F.Supp.2d 474, 480 (D. Md. 2002).

"Thus, as one court has noted, in reviewing the administrative record in an IDEA case, the district court is placed in the paradoxical position of having to be an independent finder of fact, while concomitantly giving deference to the administrative findings." *King v. Board of Educ. of Allegany County, Maryland*, 999 F.Supp. 750, 766 (D. Md. 1998), *citing Wall v. Mattituck–Cutchogue Sch. Dis*t., 945 F.Supp. 501, 507 (E.D.N.Y. 1996). "It is clear, therefore, that the starting point for the district court is to review the administrative record to determine whether the local and state decision-makers complied with the requirements of the IDEA, and to evaluate whether there is evidentiary support for the conclusions which were reached. Following this review, the district court must then determine whether it will follow the administrative fact findings, and if not, must clearly state why." *Id*.

### III.    FACTUAL BACKGROUND

The critical facts are as follows.[2]

A.C., now fourteen years old, but as of December 2017 nine years old, was assessed as having an intellectual disability (ID) qualifying her for special education.[3] ALJ Decision ¶ 38. During the 2017-2018 school year, the first school year which is, in part, at issue in this case, A.C. was placed in the Comprehensive Special Education Program (CSEP) at Gaywood Elementary School in Seabrook, Maryland. Compl. ¶ 20; ALJ Decision ¶¶ 9-10.[4] Her classroom was composed of 25 students, including both CSEP students and "general education" students. Compl. ¶ 23; ALJ Decision ¶ 20.[5]

---

[2] The Court draws its facts from the ALJ's Decision, *A.C. v. Prince George's County Public Schools*, MSDE-PGEO-OT-20-08662 (Aug. 18, 2020) (hereinafter, "ALJ Decision"), Plaintiff's Complaint, ECF No. 1, and those set forth in the parties' briefings. Although the parties did not agree to stipulated facts at the administrative hearing, and did not submit stipulated exhibits, a significant number of identical facts are present in the exhibits of both Plaintiff and Defendants. The Court cites to Plaintiff's exhibits as "Parent's Ex." and Defendants' as "PGCPS Ex.".

Though Plaintiff challenges two dozen findings of fact (FOF) of the ALJ, most of these challenges concern *how* the ALJ presented the FOF, *i.e.*, whether she noted positive attributes or progress by A.C. as well as the challenges she faced, and how she characterized the conclusions of certain assessments, *i.e.*, that A.C.'s rank was "extremely low" versus "very low." *See* Plf. Br., ECF No. 3 at 3 (hereinafter, "Plf. Br."). One factual finding by the ALJ does appear to be erroneous: FOF 20 states that there was a total of eighteen students in A.C.'s third grade class, whereas the evidence demonstrates there were in fact 25 students. Dr. Audrey James, coordinator of the CSEP Program at Gaywood Elementary School, testified that the class contained 25 students, including 17 CSEP students, 6 general education students, and 2 resource students. Tr. 780-81. But the Court finds that this error did not "impact the ALJ's ultimate conclusions," *see Whitaker v. Bd. of Ed. of Prince George's Cty Public Schools*, GLH-19-2488, *15 (D Md. Aug. 25, 2020), especially given that Plaintiff's claim with respect to the appropriateness of the placement for A.C. established in the January 2018 IEP is time-barred. Even so, the Court hereby corrects the record and finds as a fact that there were 25 students in A.C.'s third grade class.

[3] Prior to 2017, A.C. had been determined to qualify for special education. When A.C. was five years old, she was assessed as having an intellectual disability and placed in the Community Referenced Instruction (CRI) program at Glenridge Elementary School. ALJ Decision ¶ 2; Compl. ¶ 18. In 2015, she was reassessed and her disability category was changed to "specific learning disability." ALJ Decision ¶¶ 8-9. In 2017, she was reassessed again and her disability revised back to "intellectual disability." ALJ Decision ¶ 38.

[4] A.C. joined the CSEP program in the 2015-2016 school year. ALJ Decision ¶ 11. Prior to that, she was enrolled in the CRI program, which will be discussed in further detail infra. *Id.* ¶ 2. The Court recites this background for the purpose of context only but emphasizes that it falls outside of the statutory period of this case, which began on March 24, 2018. *See* 20 U.S.C. § 1415(f)(3)(C) ("A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows.").

[5] *See* note 2, *supra*.

On January 31, 2018, A.C.'s annual IEP review was held and a revised IEP established. Parent Ex. 37. This IEP took into consideration roughly a dozen assessments conducted earlier in the 2017-2018 school year, which collectively revealed that A.C. had low cognitive, verbal, and motor abilities.  ALJ Decision ¶¶ 22-38; Parent Ex. 37. The Wechsler Intelligence Scale for Children, 5th Edition (WISC-V) assessment showed that A.C. had a Full-Scale IQ (FSIQ) of 52, placing her in the 0.1 percentile. ALJ Decision ¶ 23. She also scored in the 0.11 percentile on the Bender-Gestalt Visual Motor Test—Second Edition, which assesses the child's ability to use a pencil, hands, and eyes together; the third percentile on the Test of Non-Verbal Intelligence-Fourth Edition; and the first to eighth percentile on different visual and motor skills assessed by the Beery Developmental Test of Visual-Moto Integration—Sixth Edition. ALJ Decision ¶¶ 24-25, 32-33.

The January 31, 2018 IEP provided that A.C. would receive classroom instruction provided by a special education classroom teacher in a "co-taught classroom within the [CSEP] program" for twenty-two hours and thirty minutes per week plus consultative – but not direct – occupational therapy (OT) services monthly; and indicated that at the time A.C. met the requirements for Extended School Year (ESY) services, though the IEP was later revised to remove ESY services. ALJ Decision ¶ 40; Parent Ex. 37. The IEP set forth specific instructional and testing accommodations, including noise buffers, text-to-speech, frequent breaks, calculation device, and human scribe – where the child dictates a response to be written by an aide or the teacher – among others. Parent Ex. 37. The IEP established goals in reading phonics, math calculation, and written language expression, such as, "after participating in grade level literacy lessons and activities across content areas, [A.C.] will write to communicate by writing one 5-8 word sentences using phonetically appropriate spelling related to the topic … with 100% accuracy in 4 out of 5 trials as measured by teacher's observations and work samples." Parent Ex. 37.

As it turned out, two IEP Progress Reports in 2018 indicated that A.C. was not meeting certain of the goals set forth in the January 31, 2018 EIP. The first Report, issued on April 20, 2018, indicated that, while A.C. was making sufficient progress towards her writing goal as measured by her occupational therapist, she was not making sufficient progress towards the goal as measured by her special education teacher. ALJ Decision ¶ 47; Parent Ex. 8. The first Report also indicated that while A.C. was making sufficient progress towards the math goal, she was not making sufficient progress toward the reading goal. ALJ ¶ 47. Parent Ex. 8. A second Progress Report, issued on June 20, 2018, concluded that A.C. was not making sufficient progress toward her written expression, math calculation and reading phonics goals. ALJ Decision ¶ 49; Parent Ex. 8. Notably, however, no IEP team meetings were convened (and possible revisions discussed) in response to these Progress Reports.

For the 2018-2019 school year – A.C.'s fourth grade year – A.C. remained at Gaywood Elementary in the CSEP program, though the classroom composition changed. Specifically, in the 2018-2019 school year, the class had ten students, all of whom were in the CSEP program who were in grades three, four, and five.  Compl. ¶ 25; ALJ Decision ¶¶ 50-51. In September 2018, A.C. was evaluated at reading level DRA 6 (Diagnostic Reading Assessment), which denotes the beginning first grade level. ALJ Decision ¶ 39. Even so, an IEP progress report dated November 20, 2018 indicated that A.C. was making sufficient progress towards her written, math, and reading goals. Parent Ex. 8.

On January 24, 2019, PGCPS held the annual IEP meeting to review A.C.'s situation. The resultant plan provided for OT consultative services; twenty-two hours and thirty minutes of special education services (to be provided outside the general education setting); instructional and

testing accommodations such as scratch paper, text-to-speech,[6] "reduce distractions to self," calculation device, and extended time, among others; and revised goals, such as a written goal that by January 2020, "when given (5) (oral or written) writing prompts [A.C.] will answer in writing using correct language conventions (capitalization, commos, quotation marks and periods) on (4 out of 5) sentences… with 80% accuracy." Parent Ex. 44. Two subsequent progress reports – the first, on April 11, 2019, and the second, on June 14, 2019 – indicated that A.C. was making sufficient progress on all goals under the January 2019 EIP. ALJ Decision ¶ 62-63; Parent Ex. 7; PGCPS Ex. 30.

During the 2019-2020 school year – A.C.'s fifth grade year – A.C. remained in the CSEP program class consisting of mixed-grade, CSEP-only students. ALJ Decision ¶¶ 64-65.  In the fall of 2019, A.C. once again underwent evaluations as to her status. On the DRA test, she was assessed at level 8, still a first-grade reading level. ALJ Decision ¶ 66; PGCPS Ex. 45. An OT assessment placed her in the second percentile on overall visual motor-skills; the 0.02 percentile on visual-perception, and the 0.04 percentile on motor coordination.  ALJ Decision ¶¶ 66-68, PGCPS Ex. 24. On the CELF-5, a speech and language assessment, A.C. received scores which placed her in the first percentile for receptive language and the 0.03 percentile with respect to expressive language. ALJ Decision ¶ 71; PGCPS Ex. 25A.[7] A.C.'s FSIQ was assessed at 60, placing her below the first percentile for cognition. ALJ ¶ 75.

---

[6] Text-to-speech "is a software application that converts text to synthesized speech. The software allows for adjustable voice, speech, volume, and speed of the speech output. Text displayed can be enlarged and highlighted as it is read. Most text to speech software allows for reading and study skills support as well, such as voice/ sticky notes, study skill toolbars, notes extraction, word prediction, etc. Some will read web pages and other digital formats." Maryland State Department of Education, *Maryland Accommodations Manual for Use in Instruction and Assessment*, 5-9 (July 2, 2012), https://www.law.georgetown.edu/wp-content/uploads/2018/07/Rule-18-Handout-1.Secara-1.pdf.

[7] The ALJ states that A.C. was ranked in the "three-hundredth of the first percentile." ALJ Decision ¶ 68. Plaintiff points out, correctly, that in fact A.C. ranked in the 0.3 percentile. Pl.'s Br. 4; PGCPS Ex. 25A. The ALJ appears to have made a typographical, but inconsequential, error in writing "three-hundredth[s]" rather than "three-tenths of the first percentile."

An IEP Progress Report issued on November 19, 2019 indicated that A.C. had achieved her math calculation goal and was making sufficient progress towards her written language expression, reading phonics, and reading comprehension goals. ALJ Decision ¶ 80; Parent Ex. 7, PGCPS Ex. 30. At an IEP meeting held on December 10, 2019, the team decided to add direct OT and speech and language services to A.C.'s IEP. ALJ Decision ¶ 81.

In another DRA, administered in January 2020, A.C., was assessed at DRA level 10. ALJ Decision ¶ 82. A January 14, 2020 IEP Progress Report again noted that A.C. had achieved her math calculation goal and was making sufficient progress in her other goals. ALJ Decision ¶ 83; Parent Ex. 7; PGCPS Ex. 30.

The next annual IEP meeting was held over the course of January 14 and 30, 2020. ALJ ¶ 84. In this IEP, A.C. was provided direct OT for two 30-minute sessions twice a month; direct speech/language therapy at three 30-minute sessions a month; and, as with A.C.'s other IEPs, twenty-two hours and thirty minutes per week of special education provided by a special education teacher outside general education, as well as ESY. ALJ Decision ¶86; Parent Ex. 43.  The January 14, 2020 IEP provided such accommodations as scratch paper; spell check; text-to-speech; and extended time, among others. ALJ Decision ¶ 87; Parent Ex. 43. Goals included, for instance, "given a multiplication problem up to 3-digit by 2-digit numbers, the student will determine the product by using a visual strategy… with 80% accuracy… by annual review 2021." ALJ Decision ¶ 90, Parent Ex. 43.  The IEP provided that A.C. would receive a grade level curriculum, with appropriate modifications and accommodations. Parent Ex. 43.

On March 11, 2020, a meeting was held with Central IEP to determine the placement that would best implement A.C.'s latest IEP in her next school year, her sixth-grade year. ALJ Decision ¶ 96, 100. During the meeting, the team, which included A.C.'s father (her mother, Plaintiff here,

did not attend) determined that A.C. was eligible, based on her significant cognitive disability, for an alternative curriculum and assessment framework, instead of the grade-level curriculum and standardized testing. ALJ Decision ¶ 97; Parent Ex. 50. The Central IEP team agreed that A.C. should be placed in the CRI program, which offered the alternative curriculum, small class size, slower paced instruction, as well as functional life skills curriculum. ALJ Decision ¶ 100. Though A.C.'s neighborhood school, Glenridge Elementary, offered CRI, that program ended at sixth grade. Therefore, in order to smooth the transition, the team recommended that A.C. transfer to Greenbelt Middle School beginning her sixth-grade year. ALJ Decision ¶ 100.

On March 12, 2020, Plaintiff indicated that she did not agree with A.C.'s proposed placement in the CRI program at Greenbelt Middle School. ALJ Decision ¶ 102. She stated she did not want A.C, placed in an alternative education setting, citing concern that such a placement would not prepare A.C. for a high school diploma. ALJ ¶ 102; Parent Ex. 48; PGCPS Ex. 39. Accordingly, given that she did not consent to the transfer to Greenbelt, on May 5, 2020, Plaintiff received notice that A.C. would be transferred to her neighborhood middle school Charles Carroll Middle School. ¶ 103; Parent Ex. 51.

Ultimately, however, Plaintiff decided to home-school A.C. for the 2020-2021 school year.[8] Compl. ¶ 39.

## IV.    PROCEDURAL HISTORY & ALJ DECISION

On March 24, 2020, Plaintiff filed an Administrative Due Process Complaint with the Maryland OAH, requesting a hearing to review PGCPS' identification, evaluation, or placement

---

[8] It is unclear if A.C. received any home services from Defendants during that period.

of A.C. under the IDEA for a portion of the 2017-2018 school year,[9] the entire 2018-2019 school year, and the entire 2019-2020 school year. ALJ Decision at 1. The Due Process Complaint alleged that PGCPS had denied A.C. a FAPE in six ways: (1) failing to provide appropriate IEPs on January 31, 2018, March 5, 2018, January 24, 2019, January 14, 2020, and amendments thereto; (2) failing to provide an appropriate placement/location of services in March 2020; (3) failing to provide an appropriate location of services school year 2017/18 dating back to March of 2018, school year 2018/19, and school year 2019/20; (4) failing to implement A.C.'s IEPs dated January 31, 2018, March 5, 2018, January 24, 2019, and January 14, 2020 and amendments; (5) failing to convene IEP meetings to review and revise A.C.'s IEPs to address her failure to make expected progress; and (6) failing to provide accurate quarterly IEP Progress Reports.[10] ALJ Decision at 3-4; Parent's Exhibit 1. Plaintiff, among other things, requested a non-public placement.

The due process hearing was held (virtually, because of the Coronavirus pandemic) over the course of <u>eleven</u> days from July 6 to 22, 2020, before ALJ Jocelyn Williams. Compl. ¶ 11. On August 18, 2020, the ALJ issued her decision, predicated on 104 factual findings. With respect to the alleged failure of PGCPS to implement the four IEPs, the ALJ granted PGCPS' Motion for Judgment, having determined that Plaintiff had not provided, hence there was no credible evidence of, concrete examples showing how the given IEPs were not implemented. In the ALJ's view, Plaintiff's argument boiled down to little more than a contention that, because A.C. did not make expected or desired progress, the IEPs must not have been implemented. ALJ Decision at 35-39.

_____

[9] The Due Process Complaint was filed on March 24, 2020 (Board Ex. 52). The statute of limitation bars any alleged violations occurring more than two years prior to that date. Accordingly, any claims related to the 2017-2018 school year must be confined to the period after March 24, 2018. *See* 20 U.S.C. § 1415(f)(C).

[10] The issues are presented in a slightly different order from that of the Due Process Complaint and the ALJ's decision.

The ALJ also granted PGCPS' Motion for Judgment on the issue of its purported failure to provide accurate quarterly IEP reports. ALJ Decision at 39-41. Again, the ALJ concluded that Plaintiff could point to no specifics as to the way in which the reports were inaccurate; rather, her argument was that, because the reports stated that A.C. was making "sufficient progress" on various goals, since A.C. did not ultimately achieve most of the goals, the reports must have been inaccurate. The ALJ rejected this argument, finding no evidence beyond Plaintiff's speculation that the reports were inaccurate. ALJ Decision at 40-41.

With respect to Plaintiff's claim that PGCPS provided inappropriate IEPs, the ALJ did find, at least in part, in Plaintiff's favor, namely, that PGCPS failed to provide appropriate IEPs based on its failure to provide direct speech language services in the January 31, 2018[11] and January 24, 2019 IEPs, and its failure to draft goals to address A.C.'s deficits in receptive and expressive language in the January 14, 2020 IEP. ALJ Decision at 52. As a remedy for the inappropriate IEPs, the ALJ awarded 52 hours of speech-language services. ALJ Decision at 72.

The ALJ also found in favor of Plaintiff on her claim regarding the failure of PGCPS to convene IEP meetings following the April 20, 2018 and June 20, 2018 Progress Reports that indicated that A.C. was not making sufficient progress in her written expression, math calculation, and reading phonics goals. ALJ Decision at 54. The ALJ, however, characterized this omission as a "procedural error" for which there was no remedy, since A.C. made sufficient progress subsequently. ALJ Decision at 54-55.

---

[11] Though elsewhere in her opinion the ALJ notes, correctly, that Plaintiff was time barred from raising claims arising prior to March 24, 2018, *see, e.g.*, ALJ Decision at 56 ("the Parent is time barred from raising the issue of the inappropriateness of the placement in the Student's third grade year"), the ALJ nevertheless found that the January 2018 IEP was inappropriate for failing to include speech therapy, ALJ Decision at 52. This was in error. The appropriateness of the January 2018 IEP accrued as a claim as of January 2018; therefore, it was required to be challenged, if at all, by January 2020, *see* note 15, *infra*. Accordingly, it should not have been considered by the ALJ and is not considered by the Court.

As to all other claims, the ALJ ruled in favor of PGCPS. She held that the placement selected in March 2020 for A.C.'s sixth grade year (the CRI Program at Greenbelt Middle School) was appropriate and the least restrictive environment; and that the location/placement for services for school years 2017-2018, 2018-2019, and 2019-2020 was appropriate. ALJ Decision at 71. Having determined that the March 2020 public placement was appropriate, the ALJ did not address Plaintiff's request for a nonpublic placement. *Id.*

On December 9, 2020, Plaintiff filed her Complaint in this Court, appealing the decision of the ALJ. ECF No. 1. Plaintiff requests judgment in her favor on all counts; a declaratory judgment that the ALJ Decision contained significant mistakes of fact and law rendering it erroneous; a declaratory judgment to the effect that the ALJ committed procedural errors; a declaratory judgment that PGCPS denied A.C. a FAPE on the ground of all six alleged failures; an order requiring PGCPS to provide compensatory education, a non-public placement, and amendment of A.C.'s educational records; and an order for attorney's fees. Compl. at 19-20.

On June 1, 2021, Plaintiff filed a Motion for Summary Judgment. ECF No. 26. On July 14, 2021, Defendants filed a Response and Cross Motion for Summary Judgment. ECF No. 32. Plaintiff responded, ECF No. 33, and Defendants filed a reply, ECF No. 34.  In September 2021, the Court permitted Plaintiff to submit limited additional evidence, namely, more up-to-date academic progress reports. ECF No. 36.

The Cross Motions for Summary Judgment stand ready for disposition.

## V.   DISCUSSION

Before the Court, Plaintiff makes seven specific claims in connection with the administrative proceeding.[12] The Court will address each in turn. However, the Court begins with Plaintiff's overall challenge to certain of the ALJ's factual findings.

### A.  Factual Disputes

In IDEA cases, "findings of fact by a hearing officer made in a regular manner and with evidentiary support are entitled to presumptive validity." *Doyle v. Arlington County Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1992). Plaintiff submits that the proceedings before the ALJ were not regular and, as such, the factual findings of the ALJ are not entitled to presumptive validity. Moreover, says Plaintiff, some two dozen of the ALJ's factual findings are flat-out erroneous. Pl.'s Br. 2-4. PGCPS responds that Plaintiff has failed to show that the ALJ acted in other than a regular manner, or that there was no evidentiary support for her findings, or that such errors as there might have been in any way impacted the ALJ's decision. ECF No. 32, Defs.' Br. 2-3.

Plaintiff invites attention to ten examples which she says demonstrate that the ALJ proceedings were "irregular." ECF No. 33, Pl.'s Reply 2-13. She takes issue with the ALJ's alleged failures to, *inter alia*: Control defense counsel's objections; insist upon defense counsel's adherence to her evidentiary rulings; control defense counsel's supposed abusive cross examination of Plaintiff; control the rambling responses of defense witnesses; preclude the enforcement of untimely subpoenas; preclude certain evidence; admit certain evidence; and provide adequate time for *voir dire* as well as to equitably establish the amount of time allotted to cross examination as between Plaintiff's counsel and defense counsel. Plaintiff also takes issue

---

[12] *See* text at p. 1-2, *supra*. In her Due Process Complaint, Plaintiff raised six claims similar but not identical to the claims before the Court.

with the ALJ's imposing what she terms "professionalism" breaks.[13] Taken together, Plaintiff says that the ALJ's "significant departures" from appropriate standard legal practice show that the ALJ failed to conduct a proper hearing using appropriate process, such that her findings of fact (FOFs) are not entitled to a presumption of correctness as set forth in the *Doyle* two prong standard. Pl.'s Reply 12. From there, Plaintiff challenges twenty-six FOF which she says lack evidentiary support, and four FOF of which she says were not made which should have been made. Pl.'s Br. 2-5; Pl.'s Reply 16.

Defendants respond that that Plaintiff's ten reasons assailing the hearing fall short of meeting the conditions required by Fourth Circuit precedent for showing that administrative findings were not regularly made; actionable error is recognized only where the process shows an abdication of responsibility or arbitrary decision making. Defs.' Br. 9-11. Factual questions are deemed to be resolved in the normal way when they are resolved "without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case." *J.P. ex rel. Peterson v. Cty. Sch. Bd. of Hanover Cty., Va.*, 516 F.3d 254, 259–260 (4th Cir. 2008). *See also Whitaker v. Board of Education*, *supra*, at 15-16. Defendants clearly have the better part of this argument. They say that, although Plaintiff identifies numerous rulings by the ALJ with which she disagrees, not only does she fail to establish that any of those rulings exceeded the scope of the ALJ's authority or discretion; she clearly overlooks how often rough and tumble contested litigation can be. The Court finds that none of the ALJ's rulings were outside the normal and accepted norms of the fact-finding

---

[13] On occasion throughout the eleven-day hearing, the ALJ instituted brief recesses after the proceedings became contentious, which involved often supercharged give-and-take by both Plaintiff's counsel and defense counsel. Tr. at 649 (ALJ: "And for each time that I'm observing something that I believe is inappropriate or disrespectful, if I don't feel that we can conduct this hearing professionally, we will take a break, and until such time that I feel everyone can gain – regain their professionalism."); Tr. at 663; Tr. at 670.

process, and that Plaintiff suffered no prejudice other than to frequently lose her arguments in consequence on those rulings.[14]

Indeed, criticism of the "manner in which the hearing officer expressed [her] view of the case" does not amount to an irregularly made finding. *See J.P, supra*. And that, the Court finds, is precisely what Plaintiff is engaging in here: her objections constitute little more than disagreements with how the ALJ exercised her discretion and how she expressed her views. Rulings on the admission of evidence, on objections (including with respect to the tone of counsel),[15] the

---

[14] Plaintiff goes so far as to argue that the ALJ was "unqualified" to serve as an IDEA hearing officer, citing reasons similar to those she states show the proceedings were "irregular." In other words, Plaintiff argues that the ALJ altogether lacked the ability to conduct the hearing in accordance with standard legal practice because she did not have the requisite knowledge of the IDEA and relevant case law to be able to preside over the hearing or to render and write a decision. Pl.'s Br. 32-34. These arguments are essentially *ad hominem* and unduly insulting to a judicial officer. What they do demonstrate is Plaintiff's frustration with not getting several of her points of view accepted. The Court sees nothing that in any way indicates the ALJ did not understand or failed to apply the relevant standards of the IDEA, much less that she was not fit or qualified to serve as an ALJ. Emphatically, she was fit, she is fit.

[15] Plaintiff cites to portions of the transcript in an effort to show that the ALJ failed to prevent defense counsel from, among other things, repeatedly objecting or adopting an uncivil tone. Pl.'s Reply 2-4. The record does show that defense counsel was out of line on more than one occasion and for that he certainly wins no praise. But the record also shows that Plaintiff's counsel acted similarly on more than one occasion and that the ALJ was obliged to take both counsel to task. Here are some examples:

ALJ: "Okay, okay, I'm sorry, we're not gonna go back and forth this is not the time for – excuse me, excuse me, excuse me Ms. Massey stop speaking, stop speaking. We're not gonna go back and forth and argue, we're not doing that." Tr. 415.

ALJ: "I think both of you need to stop editorializing and stick with the facts of this case so that we can move this case forward, lest eight or nine days turn into twelve, thirteen, fourteen, fifteen days which I do not want to do." Tr. 439.

ALJ: "But you are editorializing Mr. Krew. You are. So both of you are guilty of doing lots of different things that are inappropriate in this hearing." Tr. 471.

ALJ: "Ok, listen. I am not in the position to mediate a schoolyard fight. So each time someone says something that the other person doesn't like I can't continue to say, please don't do that, Ms. Massey. Please don't do that, Mr. Krew. I need for everyone to exercise professionalism and civility. I can't keep having the same conversation because we are getting nowhere." Tr. 500.

ALJ: "So I will say again that I am not going to tolerate this behavior from either of you. And so all of the back and forth and all of the bickering and all of the finger-pointing and all of the editorializing must stop, or we'll never get through this hearing. It won't happen." Tr. 665.

imposition of "professionalism" breaks, and allotment of time for different phases of the hearing were and are four square within the discretion of the ALJ. *See* Md. Code Regs. 28.02.01.11 § A (ALJ has power to "conduct a full, fair, and impartial hearing; take action to avoid unnecessary delay in the disposition of the proceedings and maintain order"). While it does appear that there was some disparity in the time allotted counsel to question witnesses, with Plaintiff's counsel apparently receiving less time than defense counsel, as Defendants point out, Plaintiff has not articulated what actual prejudice she suffered as a result (*e.g.*, that she perhaps did not have enough time to question expert X about Y). *See Whitaker*, GLH-19-2488 at *15 (ALJ allowing two and a half hours beyond allotted forty-five minutes for cross examination was not "irregular"; Plaintiff failed to show how it was legally significant or caused prejudice). As for allowing "untimely" subpoenas, the ALJ was well within her discretion to do so, even if the formal subpoenas were received by Plaintiff's counsel less than five days before trial.[16] *See Whitaker, supra*, at *16

---

The main point is that the ALJ addressed with admirable restraint what she later characterized as the "quite childish behavior for two professionals who are representing parties in this case." Tr. 666. In the annals of courtroom remonstrance, the Court finds that the ALJ's responses were very much in the mainstream.

[16] The actions of Plaintiff's counsel in this respect are concerning. The following timeline is relevant:

**June 15**: Date of Amended Pre-Hearing Report. Plaintiff's counsel does not give actual names of expert witnesses, identifying them only as "a speech and language expert," "an occupational therapist," and "a psychologist." *See* Amended Pre-Hearing Report at 4-5. Plaintiff's counsel did provide the name of Jessica Williams, who was offered as an expert in special education (ultimately she was not accepted as such by the ALJ). *See id.*; ALJ Decision at 4 n. 4.

**June 19**: Per the Amended Pre-Hearing Report, deadline to request OAH to issue subpoenas (which only OAH can do); Defense counsel submits subpoena requests to OAH. These subpoenas contain a deadline for production of documents of June 24. Defense counsel sends courtesy copies of subpoenas to Plaintiff's counsel. *See* Tr. at 337. This is all before the 5-day disclosure rule kicks in.

**June 24**: Deadline for subpoenaed individuals to produce documents set forth in the subpoenas (that have not yet been formally issued).

**June 26**: OAH issues the formal subpoenas.

**July 1**: 5-day disclosure deadline.

**July 2**: Plaintiff's counsel receives formal subpoenas, which state that documents were due June 24, which has already passed. 5-day disclosure deadline has also passed. Plaintiff's counsel does not transmit the subpoenas to

(admission of document pages not disclosed before five-day deadline was not "irregular"). CFR § 300.512(b)(2) provides that the ALJ <u>may</u> bar a party from introducing evidence that did not comply with the five-day disclosure rule, not that the ALJ <u>must</u> bar such evidence. This is what judicial discretion is all about.

With respect to the ALJ's findings of fact, as Plaintiff sees it, the ALJ ignored many facts favorable to Plaintiff, omitting, among other things, to mention the positive aspects of A.C.'s capabilities. All this, says Plaintiff, entitles her to summary judgment. Defendants suggest that Plaintiff's proposed "facts" rely on snippets of transcript taken out of context often in the testimony of witnesses the ALJ did not find to be knowledgeable or credible. Moreover, say Defendants, some of the "facts" the ALJ supposedly did not find are facts that occurred outside the statute of limitations, such as that A.C. was at DRA level 4 at the beginning of third grade.[17] The Court, in

Plaintiff's expert witnesses. *See* Tr. at 14 (ALJ Williams: Okay. Ms. Massey were the subpoenas that were served on you provided to your witnesses – your expert witnesses? Ms. Massey: No, they were not. But I did tell the witnesses about those subpoenas . . . at the time the subpoenas were received they were already outdated. In any event, everything that these witnesses have is in the Respondent's disclosures . . ."). The Court views Plaintiff's counsel's decision to disregard the subpoenas and not deliver them to her expert witnesses as totally inappropriate. Any decision as to the need to comply with the subpoenas was distinctly the office of ALJ, not Plaintiff's counsel.

**July 6**: First day of Hearing. Plaintiff's counsel objects to the subpoenas on the grounds that they were untimely, duplicative, and that it would be expensive to Plaintiff to have to compensate the experts for their time to respond. *See* Tr. at 14-26.

**July 7**: Plaintiff continues to object to the subpoenas as untimely. Plaintiff's counsel also objects to the subpoenas because one was addressed to "a psychologist" but delivered to Dr. Revel (at the direction of the ALJ during the prior hearing day), a speech pathologist (although, as explained at the hearing, in the body of the email from defense counsel, the individual was referred to as a "speech pathologist"). *See* Tr. at 232-237.

Over the continuing objection of Plaintiff's counsel, the ALJ meticulously inquires of each of the subpoenaed witnesses whether the witness in fact possessed a requested document and, if the answer was yes, the ALJ then ordered the witness to e-mail the document to defense counsel. *See, e.g.*, Tr. at 40-72 (Dr. Revel); 324-350 (Dr. Clarke); 356-392 (Jessica Williams). As a result of Plaintiff's counsel's resistance, an extended amount of time has to be spent simply procuring the documents. In the end, the requested documents are in fact largely duplicative of other evidence already in the hearing. Defense counsel obviously wanted to determine the basis, principally the documents, that were the source of the witnesses' opinions (such as IEPs), hardly a controversial tactic. Much hearing time could have been avoided if Plaintiff's counsel had been more co-operative.

[17] FOF 39 states that A.C. was assessed at DRA level 6 in her third-grade year. FOF 54 states that A.C. "remained at" DRA level 6 in her fourth-grade year. Plaintiff contends this is an error because A.C. was at DRA level 4 in third

large part, agrees with Defendants. Plaintiff's arguments, with a few exceptions that will be noted *infra*, are without merit. Much less is Plaintiff entitled to summary judgment. The ALJ could quite properly credit some witnesses more than others, including rejecting the testimony of one witness or another as less persuasive or less credible.

Having found no procedural irregularities and, apart from the class size mentioned in note 3, *supra*., no FOFs lacking evidentiary support, the Court in general declines to disturb the ALJ's factual findings.

### B.  Failure to Provide Appropriate IEPs

In Count I of her Complaint Plaintiff asserts that the IEPs for A.C. from March 2018[18] through the end of the 2019-2020 school year were not appropriate in three other ways: (i) the January 14, 2020 IEP included the accommodation of text-to-speech and/or human reader, which prevented A.C. from making academic and functional progress; (ii) the January 24, 2019 IEP included inappropriate goals for grade-level skills when AC was performing far below grade level

---

grade. The evidence shows that as of September 2017, at the beginning of her third-grade year, A.C. was at DRA level 4. *See* Parent Ex. 37 at 9. However, the evidence also shows that by the end of her third-grade year, A.C. was at DRA level 6. *See* Parent Ex. 44 at 7. Thus, the ALJ's FOF was not erroneous. It is not surprising that the ALJ cited A.C.'s score as of May 2018, rather than as of September 2017, since the statutory time period at issue here only began in March 2018.

[18] The operative IEP as of March 24, 2018 – the beginning of the statutory time period for this case – is the IEP created on January 24, 2018. The ALJ, correctly in the Court's view, concluded that she need not assess the appropriateness of the January 31, 2018 IEP because it was created before the relevant statutory period began. *See* ALJ Decision at 45.

Once again it bears repeating: "An IDEA claim accrues 'when the parents know of the injury or the event that is the basis for their claim.'" *R.R. ex rel. R. v. Fairfax Cty. Sch. Bd.*, 338 F.3d 325, 332 (4th Cir. 2003)*, quoting Richards v. Fairfax Cty. Sch. Bd.*, 798 F. Supp. 338, 341 (E.D. Va. 1992), *aff'd sub nom. Richards v. Fairfax Cty.*, 7 F.3d 225 (4th Cir. 1993) (quoting *Hall v. Knott Cty. Bd. of Educ.*, 941 F.2d 402, 408 (6th Cir. 1991)). Indeed, though conduct that occurred during the 2017-2018 school year starting after March 24, 2018 is within the statutory period of this case, the IEP itself was created before this time period; thus the appropriateness of the IEP accrued as a potential cause of action as of January 24, 2018. For that reason it falls outside the statutory period in play in the case and its propriety will not be reviewed. In contrast, the implementation of the January 2018 IEP and March 5, 2018 IEP amendment, from March 24, 2018 onward, are properly subject to review.

and failed to include direct services for occupational therapy (OT) and speech and language therapy; (iii) the January 31, 2018 and March 5, 2018 IEPs included an inappropriate written language expression goal that used grade-level testing when A.C. was performing below grade level, failed to include direct OT and speech-language services, and placed A.C. in a general education classroom, and included the accommodation of text-to-speech. Compl. ¶ 45. As discussed, Plaintiff prevailed before the ALJ on her claim that three IEPs were inappropriate to the extent that the January 31, 2018 and January 24, 2019 IEPs did not provide direct speech therapy, and insofar as the January 14, 2020 IEP did not include goals to address A.C.'s deficits in receptive and expressive language. ALJ Decision at 52. What remains are Plaintiff's claims as to allegedly inappropriate goals of the January 2019 IEP—Defendants' alleged failure to include <u>direct</u> OT services in the January 2019 IEP; and the text-to-speech accommodation in the January 2020 IEP.[19] The Court also addresses Plaintiff's argument that the ALJ's award of 52 hours of speech language services to compensate for Defendants' failure to include direct speech services in the 2019 IEP was inadequate and her request that the Court award an additional 98 hours of speech services for A.C. *See* Pl.'s Reply 24, n. 8.

Plaintiff's arguments invariably center on her belief that the ALJ improperly discounted the testimony of her expert psychologist, Dr. Clarke that, for instance, A.C. had attention problems, that certain accommodations such as text-to-speech prevented A.C. from practicing skills, and that the provision to A.C. of grade level instruction was inappropriate. Pl.'s Br. 12-13. Plaintiff also suggests that certain testimony from Resource Teacher Marciel Bustos supported Plaintiff's argument that, for instance, the text-to-speech accommodation might be inappropriate.  *See id.*

---

[19] As indicated, the Court will not address the inappropriateness of the 2018 IEPs, *see* note 18, *supra*.

With respect to the grade level goals, Plaintiff argues that the goals were demonstrably inappropriate because, from third to fifth grade, A.C. failed to reach all but one goal – her 2019 IEP math calculation goal. *Id*. at 14. Plaintiff further argues that the ALJ overlooked her claim that the IEPs were insufficient for failing to provide direct occupational therapy (OT) services, when the evidence showed that A.C.'s OT scores from 2017 to 2019 decreased. Pl.'s Reply 15. Plaintiff points to the testimony of Kathleen Fitzgerald, the school's occupational therapist, to support her assertion that OT services were needed. *Id*. at 16-17. On the other hand, Plaintiff attacks the testimony of the school psychologist Dr. Susan Schwalb-Gerson (Dr. Gerson) on these points as "untruthful," taking the ALJ to task for giving that testimony "great weight."[20] Pl.'s Br. 17.

Defendants, in any event, respond that Plaintiff is asking this Court to ignore the firmly established principle of deference to be given to the ALJ's determinations with respect to credibility. It is a fair point. The Court declines to second guess the ALJ's determination that she found Dr. Gerson, the PGCPS school psychologist, more credible than Dr. Clarke, the private psychologist hired by Plaintiff. *Doyle*, 953 F.2d at 104. Plaintiff scores no points attacking Dr. Gerson's credibility and, in any event, disregards a main point of her testimony: *i.e.*, that A.C.'s progress, such as it was, was commensurate with her IQ of 52. Finally, Defendants point out that the ALJ indeed did in fact consider the testimony of the occupational therapist at the school, Katharine Fitzgerald, which the ALJ determined supported the finding that the school had implemented A.C.'s OT services as provided for in the IEPs. *See* ALJ Decision at 39.

---

[20] Plaintiff highlights eight issues which Dr. Gerson testified about that she contends were either contradicted later by Dr. Gerson herself or by other witnesses. Pl.'s Br. 17-19. The Court concludes that the ALJ fairly evaluated the asserted contradictions and divergent testimony of Dr. Gerson in reaching her credibility determinations and sees no basis to conclude that the testimony was somehow "untruthful." The fact that Dr. Gerson may have elaborated or clarified her responses, or that other witnesses may have testified differently, in no way rendered Dr. Gerson's testimony "untruthful" such that the Court should, as Plaintiff suggests, reject it. P. Br. at 17, n. 9, *citing Monroe-Lord v. Hytche*, 668 F. Supp. 979, 999 (D. Md. 1987), *aff'd*, 854 F.2d 1317 (4th Cir. 1988).

"[T]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *R.F. by & through E.F. v. Cecil Cty. Pub. Sch.*, 919 F.3d 237, 245–46 (4th Cir. 2019) (quoting *Endrew F. ex rel. Joseph F.*, 137 S. Ct. at 994). Though it is more demanding than a "merely more than de minimus test," IDEA emphasizes a right to "the provision of an appropriate education, and adequate – not perfect – IEP." *Endrew F. ex rel. Joseph F.*, 137 S. Ct. at 1000; *M.L. v. Smith*, No. PX 16-3236, 2018 WL 3756722, at *9 (D. Md. Aug. 7, 2018). To remind: The Court "must make an independent decision based on a preponderance of the evidence, while giving due weight to the state administrative proceedings." *Sanger v. Montgomery Cty. Bd. of Educ.*, 916 F. Supp. 518, 520 (D. Md. 1996). The ALJ's findings are to be considered *prima facie* correct when, as here, they have been made in the course of the normal fact-finding process. *See Doyle*, 953 F.2d at 105. The determination of whether an IEP is adequate "is itself a question of fact." *M.L. by Leiman v. Smith*, 867 F.3d 487, 493 (4th Cir. 2017). Applying these standards to this case, the Court has no difficulty concluding that the ALJ's findings are entitled to *prima facie* correctness, and that Plaintiff has failed to rebut this presumption. There is one caveat however. The Court agrees that the ALJ did not address Plaintiff's contention that the January 31, 2019 IEP was inappropriate for failing to provide direct OT services. The Court will remark on this particular matter in a moment.

For now, the Court considers Plaintiff's arguments as to A.C.'s IEP goals. She returns to her mantra that the goals, which were based on grade-level subject matter with adjusted objectives, were clearly inappropriate because A.C. in fact failed to achieve nearly all of them. Indeed, in certain cases, it may be true that "[t]he fact the Student met no goals as of [an] IEP is indicative of the inappropriateness of the IEPs." *Student v. Montgomery County Pub. Schl.*, OAH Case No.

MSDE-MONT-OT-19-30951 (Dec. 23, 2019). Even so, the failure of a child to achieve goals does not necessarily mean that the goals were inappropriate. "Although progress may be an indicator of whether an IEP was reasonably calculated to provide a free appropriate public education, it is ultimately irrelevant whether the child did in fact make progress pursuant to the IEP. . . the school district still meets its statutory mandate so long as the school district can prove that the IEP, when it was created, was reasonably calculated to provide some educational benefit." *See, e.g., Bd. of Educ. of Cty. of Kanawha v. Michael M.*, 95 F. Supp. 2d 600, 609 (S.D.W. Va. 2000). With this perspective in mind, the Court finds that the ALJ could reasonably conclude that A.C.'s IEPs were appropriate.

First of all, the ALJ considered the testimony of Dr. Clarke that A.C.'s goals were inappropriate given that A.C. was performing at a kindergarten or first grade level. However, the ALJ concluded that, in her judgment, Dr. Clarke's understanding was incomplete, leading her to credit instead the testimony of Dr. Audrey James, CSEP Coordinator, who explained that "the general educator introduced a graded level curriculum topic which was done with the whole class. Then the students were divided into small groups which worked on the graded level topic or subject but on an instructional level that was appropriate to the Student and with the supports and accommodations that were specified in her IEP." ALJ Decision at 43.

The ALJ acknowledged the fact that A.C. had not achieved most of her goals. But "[a]fter carefully considering all of the testimony and reviewing every exhibit… [she] considered the IEPs and amended IEPs as a whole to see if they reflect progress by [A.C.].  The Parent argued they do not reflect progress and argued the IEPs were not appropriate." But the ALJ "disagree[d] and [found] [A.C.'s] progress, although slow and at times minimal, was appropriate in light of her circumstances." ALJ Decision at 42. Unquestionably, Dr. Clarke, Plaintiff's psychological expert,

testified that A.C. "is deficient in verbal and non-verbal abilities, and that she has the ability to learn but at a slower pace." ALJ at 42. And, to be sure, the IEP Progress Reports in evidence clearly showed that A.C. ultimately met just one goal. *See* Parent Ex. 8 (IEP Progress Report, November 20, 2018); Parent Ex. 7 (IEP Progress Report, dated January 14, 2020). But, as the ALJ noted in reviewing the accuracy of the Progress Reports, "the IEP is not a contract and there is no guarantee that a child will meet a specific goal or goals." ALJ Decision at 40. Plaintiff insists that the ALJ overlooked this lack of progress – the Court finds she clearly did not overlook it – and again falls back on her assertion that the goals must have been inappropriate because of A.C.'s limited progress. But, here as elsewhere, Plaintiff is articulating a classic *post hoc* fallacy.[21] For instance, on A.C.'s 2019 IEP reading comprehension goal, the Progress Reports showed progressive improvement from 60 percent accuracy on one component of her goal, to 70 percent, to 80 percent. *See* Parent Ex. 7 at 3. Though A.C. did not ultimately achieve the goal, she did make some progress, which is to say that the mere fact of some improvement clearly tends to negate the suggestion that the goal was inappropriate; other factors may well have been responsible for A.C.'s failure to meet the goals. The Court therefore affirms the ALJ's finding that the grade level goals were not inappropriate. If the sort of argument Plaintiff proffers were allowed to prevail, in virtually every case where a student failed to meet her IEP goals, denial of a FAPE would *ipso facto* be established.

Plaintiff also argues that the accommodation of text-to-speech was inappropriate because it did not push A.C. to improve her writing skills.[22]   This issue was heavily litigated in the

---

[21] The complete phrase is "post hoc, ergo propter hoc," a common fallacy in logic meaning "after this, therefore because of this." *See Post hoc*, The *American Heritage Dictionary of the English Language* (5th ed. 2011). In other words, just because B followed A in time does not mean that A caused B.

[22] To remind, text-to-speech is a software application that converts text to synthesized speech. *See* note 7, *supra*. Voice-to-text, or "speech-to-text," permits "[s]tudents with motor and/or writing difficulties may use speech-to-text

administrative hearing, with some witnesses agreeing with Plaintiff's point, and others offering testimony as to the benefits of text-to-speech. For instance, Dr. Clarke testified on Plaintiff's behalf, and the ALJ listened to the argument that the use of voice-to-text was appropriate only for a "limited time," because it did not allow A.C. to practice her skills, and was only a "band-aid." ALJ at 43. Still, the ALJ gave "less weight" to Dr. Clarke's testimony because Dr. Clarke had never met nor had she even observed A.C. or her teachers. The ALJ, moreover, expressly rejected Dr. Clarke's editorial comment that the accommodations provided were a "band aid." ALJ Decision at 44. To the contrary, the ALJ found the accommodations "allowed A.C. to access the grade level curriculum" and "quickly express her thoughts without having to write and thus be encumbered by the deficiencies in her fine motor skills." ALJ Decision at 44. The ALJ weighed these considerations and arrived at the conclusion that this particular accommodation was not inappropriate. *Compare Bd. of Educ. of Frederick Cty. v. I.S. ex rel. Summers*, 325 F. Supp. 2d 565, 582 (D. Md. May 7, 2004) (evidence supported ALJ finding that accommodation of special education assistant inappropriate where assistant blocked view of teacher, added auditory input to already easily distracted student, disrupted social interactions, and reduced dependence). Indeed, the notes in A.C.'s Progress Report of January 2020 describe how A.C.'s accommodations, such as text-to-speech, enabled her to participate in class and access grade level content. PGCPS Ex. 33. The Court finds the evidence fairly supports the appropriateness of text-to-speech.

As for the alleged failure of Defendants to provide direct occupational therapy (OT) services, Defendants argue the ALJ did consider direct OT services, but Plaintiff points out that Defendants actually cite to the ALJ's discussion of the provision of OT services – consultative in

---

software to produce written documents. This type of software translates oral speech into a typed document." Maryland State Department of Education, *Maryland Accommodations Manual for Use in Instruction and Assessment*, 4-41 (Oct. 1, 2017), https://www.ppmd.org/wp-content/uploads/2019/07/MAM508102017.pdf.

nature only – in the section of her decision addressing the *implementation* of the IEPs. The ALJ did not, in fact, address the *appropriateness* of the lack of <u>direct</u> OT services as recommended in the 2019 IEP. Plaintiff clearly challenged the lack of direct OT services in her Due Process Complaint, alleging that the January 31, 2018, March 5, 2018, and January 24, 2019 IEPs were inappropriate because they "failed to include direct related services in the areas of OT." Parent Ex. 1 at 9; ALJ Decision at 42-52. Plaintiff's allegation fairly raises the ALJ's possible error in failing to consider the appropriateness *vel non* of direct OT services.

The record shows that A.C. did receive direct OT services in her second-grade year, 2017-2018, consisting of once-monthly sessions of 30 minutes each over the course of 36 weeks. Tr. 770. However, for some reason, direct OT services were removed from A.C.'s 2017 IEP, though apparently she still was provided with consultative OT services. *See* Parent Ex. 34 at 25 (1/31/18 IEP); Parent Ex. 37 at 26 (5/15/18 Amended IEP); Parent Ex. 44 at 27 (1/24/19 IEP); Tr. 799-803 (Dr. James' testimony that all direct related services were removed from the January 2018 IEP and that this meant A.C. was no longer working directly with the OT provider). But then, in her 2020 IEP, direct OT services were added again, specifically of 30 minutes duration twice a month. Parent Ex. 43, at 39.

The Court thus considers whether the lack of <u>direct</u> OT services in the 2019 IEP, unaddressed by the ALJ, constituted a denial of a FAPE. The Court concludes that it did. A.C.'s potential benefit from OT services, particularly as to her fine motor skills and writing, are amply documented in the record. As of the January 2019 IEP, A.C.'s fall 2017 assessments – the last before the development of the 2019 IEP – indicated that her OT assessment was in the low to very low range—characterized by an overall visual-motor score of 66 (very low), a visual perceptual score of 79 (low range), and a motor coordination score of 79 (low range). The accompanying

27

notes indicated that A.C. "works slowly during writing tasks and has errors when copying such as omitted words. She has difficulty initiating her work and difficulty independently constructing a sentence . . . She can answer questions verbally but her written responses contain letter reversals, mis-sequenced letters, spelling errors and omitted words. She does not consistently leave space between her words when writing." Parent Ex 44 at 3.

In A.C.'s June 20, 2018 IEP Progress Report, her occupational therapist noted that A.C. "has difficulty… being able to write her answers down in sentence form. During OT she is unable to construct her own sentence although she can copy sentences legible from a near mode." Parent Ex. 8. By November 20, 2018, she was "easily able to copy a simple sentence," but still was "not using phonetically appropriate spelling during OT sessions." *Id.*

In 2019 A.C.'s performance continued to be mixed. The OT note in her January 24, 2019 IEP stated that, "while [A.C.] can near point copy short amounts of information, she struggles to construct and write her own sentences . . . When writing, [A.C.] is noted to reverse the order of words or write them out of sequences . . . Since [A.C.] is *unable to write her own sentences*, she needs alternate means to complete assignments such as underl[ining] word/picture choices, highlighting and crossing out answer choices." Parent Ex. 44 at 11 (emphasis added). Despite the foregoing, no direct OT services were included in A.C.'s January 2019 IEP.

As of June 14, 2019, A.C.'s occupational therapist reported that A.C.'s "writing is legible with consistent spacing and letter line placement." Parent Ex. 7. In a report issued on October 14, 2019, A.C.'s Beery-Buktenica test cited A.C.'s overall visual motor skill (score 59), her visual perception (score 45), and motor coordination (score of 47), which is to say, very low scores in all areas. Parent Ex. 43 at 16-17; PGCPS Ex. 24. That assessment, which informed her 2020 IEP, did

result in the provision of direct OT, where it was noted that AC "formed letters legibly, although not always with appropriate letter formation, often starting her letters from the bottom… She did not omit any letters during copying, although omitted 1 space between her words and copied "anythink" instead of "anything" without realizing her mistake… [A.C.] was able to write letters and words from memory into the graphic organizer, however, without a defined writing boundary (lines), her ability to space between her words and her overall legibility decreased." Parent Ex. 43 at 6; PGCPS Ex. 24. In November 2019, the occupational therapist reported that A.C. "continues to need reminders to review her work for errors in copying and spacing, however, she has been able to consistently write with overall legibility in context." Parent Ex. 7.

A.C.'s January 14, 2020 IEP indicated that she had very low ability in sentencing writing fluency, which measures skills in forming and writing simple sentences quickly. She had low average abilities in writing sentences, with challenges in formulating sentence following prompts, with spacing issues in particular. Parent Ex. 43. Thus, in her January 2020 IEP, direct OT services were added in order to "establish self-management skills and visual-motor skills as they related to handwriting performance in the classroom." Parent Ex. 43 at 39.  The question arises, then – why weren't direct OT services made part of the 2019 IEP? All the signs pointing to the propriety of including them were there and continued to be there into 2020.

Just as the ALJ found with respect to the lack of direct speech therapy in the 2019 IEP, the Court finds that the lack of <u>direct</u> OT therapy in A.C.'s 2019 IEP also amounted to denial of a FAPE. A.C.'s challenges with fine motor skills were very apparent as of her 2019 IEP. Though various reports suggested strong motivation and some improvement on A.C.'s part, she was consistently reported as being slow to write, with enduring errors such as in spacing. Moreover, as the ALJ concluded with regard to the lack of speech therapy, A.C.'s declining scores in her OT

assessments from 2017 to 2019 firmly support the conclusion that the lack of direct services was inappropriate. *See, e.g., Board of Educ. of Frederick County v. I.S. ex rel. Summers*, 325 F.Supp.2d 565, 588 (D. Md. 2004) (affirming ALJ decision finding IEP inappropriate where, among other things, IEP reduced OT from 30 minutes per week to consultation and students' handwriting regressed thereafter). Finally, the challenges A.C. faced that spurred the inclusion of direct OT in the 2020 IEP, *i.e.*, challenges in formulating sentences and writing quickly, were clearly noted as of the 2019 IEP. There writing challenges were seen as directly affecting her ability to participate in class, such that alternatives to writing had to be devised to permit her to keep up. The denial of direct OT was thus a meaningful one for the purposes of IDEA. In light of this, the Court concludes that the lack of direct OT services in A.C.'s 2019 IEP amounted to the denial of a FAPE.

In terms of remedy, in the face of IDEA violations, courts may "grant such relief as [they] determine is appropriate," 20 U.S.C. § 1415(e)(2). When a FAPE is not provided to a disabled student, the student's parents may seek an award of "compensatory education." *Y.B. v. Bd. of Educ. of Prince George's Cty.*, 895 F. Supp. 2d 689, 693 (D. Md. 2012) (citing *G. ex rel. Ssgt RG v. Fort Bragg Dependent Sch.*, 324 F.3d 240, 253–54 (4th Cir.), *opinion amended on reh'g sub nom. G ex rel. RG v. Fort Bragg Dependent Sch.*, 343 F.3d 295 (4th Cir. 2003)). Such "educational services are 'ordered by the court to be provided prospectively to compensate for a past deficient program,' i.e., the school's failure to provide the student with a FAPE." *Id.* at 693–94. The Court notes that the January 2020 IEP provided for two 30-minute sessions of direct OT services a month. Here, in compensation for the omission of such services in 2019, the Court awards A.C. two sixty-minute sessions a month for twelve months. The Court believes this is a fair equivalent of the services A.C. should have received from January 2019 – January 2020, based on the level of services provided in the January 2020 IEP.

Finally, Plaintiff argues that the remedy awarded for PCGPS' failure to provide direct speech therapy in the 2019 IEP was inadequate. In this regard, after concluding that Defendants' failure to provide direct speech therapy services in the 2018 and 2019 IEPs constituted a denial of a FAPE, the ALJ crafted a compensatory remedy of speech therapy for sixty minutes per week for twelve months (52 hours). Plaintiff argues that the remedy should be increased to provide an additional 98 hours of therapy, while Defendants contend that the award the ALJ would give is appropriate and should not be increased.  Pl.'s Reply 14 n. 8; Pl.'s Br. 15.

The Court agrees that the remedy provided by the ALJ, which amounts to a more intensive intervention than the three thirty-minutes sessions monthly provided in the 2020 IEP, was appropriate. Indeed, the Court notes that the ALJ crafted her proposed award based on the denial of speech therapy in the 2018 and the 2019 IEPs, whereas she should have only provided a remedy for the failure as of the 2019 IEP (again the January 2018 IEP fell outside the statutory timeframe in this case). *See* Parent Ex. 43 at 39. In effect, then, the ALJ was giving A.C. extra compensation for the omission. The Court will not reduce the ALJ's award even though it may be based in part on an omission on Defendants' part that fell outside of limitations. But Plaintiff has supplied no valid reason, other than her mere preference, why the ALJ's proposed award should be increased.

## C.  Failure to Convene IEP Meetings

The IDEA requires that an IEP Team review and revise an IEP as may be appropriate to address any lack of a student's expected progress toward the annual goals. *See* 20 U.S.C. § 1414(d)(4)(ii)(I); 34 C.F.R. § 300.324(b)(1)(ii); Md. Code Regs. 13A.05.01.08(B)(1).  Before the ALJ, Plaintiff alleged – and the ALJ agreed – that PGCPS failed to hold IEP meetings to review and revise A.C.'s IEP in April and June of her third grade year, 2018, when A.C.'s progress stalled

and when the Progress Reports indicated she was not making sufficient progress towards her goals with respect to written language expression, math calculation, and reading phonics. The ALJ determined that this "procedural error" amounted to the denial of a FAPE, *see* ALJ Decision at 54. However, the ALJ determined that there was no remedy for the violation, reasoning that A.C. subsequently made sufficient progression as later reports showed and that the IEP team eventually did hold meetings to update A.C.'s goals and objectives. *See* ALJ Decision at 55.

Before the Court, Plaintiff asserts that the ALJ's failure to craft a remedy for the denial of an acknowledged FAPE constituted "reversible error." She requests that the Court either (1) craft an appropriate remedy to compensate A.C. for PGCPS's failure to hold IEP meetings to review and revise A.C.'s IEP at the end of her 3rd grade year; or (2) remand the matter to the ALJ and instruct her to do so. Pl.'s Br. 22.

Defendants respond that Plaintiff has given no good reason to reverse the ALJ's determination that no remedy is proper to address the School Board's failure to convene IEP meetings to address the April 2018 and June 2018 progress reports, and that, moreover, she fails to suggest what an appropriate remedy might look like. Defendants rely on the ALJ's reasoning that A.C. ultimately made progress and that the IEP team eventually held meetings to devise updated goals and objectives.

The Court agrees with Plaintiff. A.C. is entitled to a remedy for this denial. *See Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369–70, 105 S. Ct. 1996, 85 L. Ed. 2d 385 (1985), superseded by statute on other grounds in *Pollowitz v. Weast*, 90 F. App'x 438 (4th Cir. 2001) ("equitable considerations are relevant in fashioning relief," and the court has "broad discretion" in the matter).

To remedy IDEA violations, courts may "grant such relief as [they] determine is appropriate," 20 U.S.C. § 1415(e)(2). However, not all forms of relief are appropriate. *See Hall by Hall v. Vance Cty. Bd. of Educ.*, 774 F.2d 629 (4th Cir. 1985). For instance, the IDEA did "'not create a private cause of action for damages for educational malpractice.'" *Sellers by Sellers v. Sch. Bd. of City of Mannassas, Va.*, 141 F.3d 524, 526 (4th Cir. 1998) (*quoting Hall by Hall*, 774 F.2d at 633 n.3). "Tort-like damages are simply inconsistent with the IDEA's statutory scheme." *Id.* at 527. An award of "compensatory education," on the other hand, may be sought to remedy a denial of a FAPE. *See Y.B. v. Bd. of Educ. of Prince George's Cty.*, 895 F. Supp. 2d 689, 693 (D. Md. 2012) (citing *G. ex rel. Ssgt RG v. Fort Bragg Dependent Sch.*, 324 F.3d 240, 253–54 (4th Cir.), *opinion amended on reh'g sub nom. G ex rel. RG v. Fort Bragg Dependent Sch.*, 343 F.3d 295 (4th Cir. 2003)).

When a procedural defect is found, the court must assess whether it resulted in the loss of an educational opportunity or whether it was only a technical violation. *MM ex rel. DM v. Sch. Dist. of Greenville Cty.*, 303 F.3d 523, 533 (4th Cir. 2002). In a sense, the failure to hold the IEP meetings could be viewed as largely a technical one, given A.C.'s eventual progress. The IDEA provides that a procedural violation will only amount to a denial of FAPE if it: "[1] impeded the child's right to a free appropriate public education; [2] significantly impeded the parents' opportunity to participate in the decision making process regarding the provision of a free appropriate public education to the parents' child; or [3] caused a deprivation of educational benefit." 20 U.S.C. § 1415(f)(3)(E)(iii).

In the present case, consideration of these factors leads the Court to conclude that the failure of PGCPS to convene these particular IEP meetings was more than a technical violation.[23] A local educational agency is required to ensure that the IEP team "reviews the child's IEP periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved" and "revise the IEP as appropriate to address . . . a lack of expected progress." 20 U.S.C. § 1414(d)(4)(A)(ii). Here, it cannot be gainsaid that the failure to review and revise the IEP deprived A.C. of possible educational benefits – the third applicable factor – to address whatever barriers were preventing her from making sufficient progress towards her goals at the time. *Compare R.F. v. Cecil Cty. Pub. Sch.*, No. ADC-17-2203, 2018 WL 3079700 (D. Md. June 21, 2018), *aff'd sub nom. R.F. by & through E.F. v. Cecil Cty. Pub. Sch.*, 919 F.3d 237 (4th Cir. 2019) (failure to hold IEP meeting before changing student's placement constituted procedural violation but did not rise to the level of a denial of a FAPE). Accordingly, while the Court embraces the ALJ's conclusion that the failure to convene IEP meetings to address A.C.'s failure to make progress in the indicated time frame constituted a denial of a FAPE, the Court departs from the ALJ when it comes to remedy.

In terms of remedy, the IDEA permits injunctive remedies, such that the Court could order PGCPS to review and revise A.C.'s IEPs. 20 U.S.C. § 1415 (f)(3)(E) ("Nothing in this subparagraph shall be construed to preclude a hearing officer from ordering a local educational agency to comply with procedural requirements under this section."). But, such a remedy would essentially be of little practical utility in a case where the missed meetings occurred years ago.

---

[23] Since the factors are listed in the disjunctive, it is only necessary to find that one of them is fulfilled, such that it becomes unnecessary to address the other factors.

Compensatory education awards "should aim to place disabled children in the same position they would have occupied but for the school district's violations of IDEA," *Reid ex rel. Reid v. D.C.*, 401 F.3d 516, 518 (D.C. Cir. 2005). Plaintiff argues here that AC's progress could have been put back on track before the end of her third-grade year, if PGCPS had held IEP meetings in April and June of 2018. She argues that tutoring services and a private placement are both reasonable options for a compensatory award in this case. She also argues that another reasonable option would be "the establishment of a fund to be spent on the child's education." *See D.F. v. Collingswood Borough Bd. of Educ.*, 694 F.3d 488, 498 & 496 (3d Cir. 2012) ("IDEA grants a district court reviewing an IDEA claim the authority to grant whatever relief it determines is appropriate.").

The Court is not persuaded that most of the remedies proposed by Plaintiff are appropriate. A fund would, in essence, be a tort-like remedy, which is not permitted under the IDEA. *See Sellers by Sellers*, 141 F.3d at 527. A private placement, likewise, would be inappropriate, given the fact that A.C.'s prior IEPs were, over time, reviewed and revised, and indeed her progress improved. *Compare* A.C.'s case with *M.G. v. D.C.*, 246 F. Supp. 3d 1 (D.D.C. 2017) (approving private school tuition reimbursement ordered where parent unilaterally placed student who suffered from major depression, anxiety disorder, and attention deficit hyperactivity disorder (ADHD) in private school where school district was on notice of need for IEP and failed to convene IEP meeting at all). Plaintiff has not convincingly shown why and how a private placement today would be a proper remedy for the past omissions.

That said, some remedy is in order.

Compensatory education in the form of tutoring or other services would appear most appropriate. While the Court can only speculate as to the precise negative effects on A.C.'s progress that Defendants' omitted IEP revisions in April and June 2018 might have had, it is nevertheless hard not to conclude that <u>some</u> opportunity for A.C. to progress was likely lost. With that in mind, in an effort to augment the position A.C. very possibly would have been in but-for Defendants' failure to convene the IEP meetings, the Court will order 8 months' worth of tutoring services, one hour a week, to offset any gaps accruing from April 2018 until A.C.'s IEP was reviewed and revised in January 2019.

### D.  Placement Selected in March 2020

In Count III of her Complaint, Plaintiff argues that the ALJ erred in concluding that PGCPS did not violate IDEA when it determined, in March 2020, that A.C.'s placement for the following year would be the CRI Program at Greenbelt Middle School. Plaintiff argues that the ALJ's analysis fails to note the ways in which the CRI program focuses on functional life skills (*e.g.*, daily dressing, self-care, creating shopping lists) which, in Plaintiff's view, were not what A.C. needed and which she does not need now. Pl.'s Br. 29-31. Plaintiff contends, moreover, that CRI and the skills it focuses on are inappropriate and would harm A.C.'s ability to obtain a high school diploma.[24] Pl.'s Br. 28-19. Plaintiff says the ALJ discounted testimony that A.C. regressed in her use of language during her first time in the CRI program in kindergarten and first grade and that her language use only improved once she was removed from the program. Plaintiff notes that there is no CSEP equivalent – the program A.C. was placed in for third through fifth grade, which

---

[24] At the same time, in a footnote Plaintiff seems to argue that the CRI program would be too challenging because it would expose A.C. to grade-level curriculum. Pl.'s Br. 29, n. 14.

includes grade-level curriculum – in PGCPS for middle school. She continues – since only the CRI program or general education with support was available in middle school, if that was all PGCPS had to offer, it was not individually tailored to A.C.'s needs and therefore amounted to denial of a FAPE. A nonpublic placement, Plaintiff submits, is the only reasonable course of action under the circumstances.[25] Pl.'s Br. 30.

Defendants argue that Plaintiff provides no legal justification for rejecting the ALJ's determination that the School Board designated an appropriate placement for A.C. when it decided in March 2020 to place her at the CRI program at Greenbelt Middle School the following year. Defendants point to the ALJ's credibility finding regarding the testimony of Troi Dubose-Cooper, PGCPS special education instructional assistant, and that of Katharine Thomas, occupational therapist, as to the benefits of CRI, and the drawbacks of a non-public placement for A.C. where, for instance, she would not be interacting with non-disabled peers. Rather than choosing CRI because it was the "only option," Defendants say the ALJ correctly determined that a CSEP program, if it existed, would not have been commensurate with A.C.'s needs, and that the CRI program represented the least restrictive and most appropriate placement for her.  ALJ Decision at 68.

As to this, the Court stands with the ALJ.

In reviewing this issue, the Court accords due weight to the credibility determinations of the ALJ as fact finder. Her determinations tilted decisively in favor of Katharine Thomas, who testified to the benefits of the CRI program, and against Plaintiff, A.C.'s mother (not herself an

---

[25] As of the original briefing in the case, Plaintiff had not been able to obtain private school placement for A.C. due to Covid disruptions. The Court understands Plaintiff subsequently obtained a private school placement for her and has submitted supplemental briefing related to A.C.'s progress since the Due Process hearing. *See* ECF Nos. 22, 35.

expert), who took the position that, in her view, A.C. did poorly in the CRI program previously, and that it was not advanced enough for A.C. Tr. 96-97, 121-122, 134, 213. The CRI program, however, offered class sizes of eight to twelve students with three adults in each class. ALJ at 64. Additionally, the program would not, as Plaintiff asserts, necessarily mean that A.C. would not be on a "diploma track," a decision which is reviewed annually. Tr. 97; ALJ Decision at 66. Moreover, the ALJ concluded that for A.C., who continued to perform significantly below grade level, the CRI program would most suitably have permitted her to progress in line with her abilities; there would be no benefit to keeping her in grade-level instruction if she continued to fall behind. ALJ Decision at 67.

The Court agrees that the evidence supports the ALJ's conclusion that the placement of A.C. in the CRI program, selected in March 2020 for the following year, was appropriate. The fact that there may have been no CSEP program in the PGCPS at that grade level does not nullify the conclusion that the CRI program was appropriate.

### E.  Placements for the 2018-2019 and 2019-2020 School Years

In Count IV of her Complaint, Plaintiff contends that A.C.'s placement for the 2017-2018, 2018-2019, and 2019-2020 school years were inappropriate. But to remind yet again: The statutory time period for this case began in March 2018, meaning A.C.'s placement for the 2017-2018 school year began in 2017, before the statutory period. The ALJ was therefore correct in determining that Plaintiff was time-barred from challenging that placement. As for the 2018-2019 and 2019-2020 school years, Plaintiff contends that, to the extent that the ALJ categorized A.C.'s "placement" as "the CSEP program," and determined it was appropriate, the ALJ failed to account for the ways in which the program at Gaywood Elementary had changed.

Plaintiff submits that "placement" refers to the overall educational program. *A.K. ex rel. J.K. v. Alexandria City Sch. Bd.*, 484 F.3d 672, 680 (4th Cir. 2007) (*citing AW ex rel. Wilson v. Fairfax Cty. Sch. Bd.*, 372 F.3d 674, 676 (4th Cir. 2004)). She insists that she presented evidence sufficient to prove by a preponderance of the evidence that PGCPS failed to provide A.C. with an appropriate placement. Plaintiff's main point is that A.C. made significant progress in first and second grades, when she was in a class of ten special education students with a special education teacher, but that her placement, within the CSEP program, for fourth and fifth grades in a class of ten disabled students of three different grade levels was clearly inappropriate because A.C., in her view, did not fare well. Plaintiff asserts her belief that these placements were due to overall school needs, not, as the IDEA requires, specifically designed for A.C.'s unique needs, because these were the *only* classes Gaywood Elementary had to offer in the CSEP program. Therefore, says Plaintiff, PGCPS could not and did not consider changing the frequency and intensity of A.C.'s services in terms of her placement despite her poor performance in fourth and fifth grades.

Defendants respond that Plaintiff gives no compelling reason for reversing the ALJ's decision that A.C.'s placement was appropriate. They note that, to be sure, Plaintiff, as found by the ALJ, took issue with no Gaywood Placement.[26] Defs.' Br. 17; ALJ Decision at 55. But they suggest that Plaintiff cites testimony out of context to support her argument – in fact some of the testimony she relies on came from witnesses who ultimately testified to the appropriateness of the CSEP placement. Moreover, Plaintiff's claim that the ALJ disregarded changes to the CSEP program, say Defendants, is belied by the ALJ's FOF 9, which explicitly mentions the

---

[26] Plaintiff testified she was not satisfied with the homework, teaching methods, and teacher assigned in A.C.'s fourth and fifth grade years in the CSEP program. Tr. 146-155, 162-165. The record confirms, however, that Plaintiff did not object to the proposed IEP placement itself – *i.e.*, the CSEP program at Gaywood Elementary.

reconfigurations of the Gaywood program for the 2017-18 school year; the ALJ's summary, at page 37, of Dr. James' testimony about the program;[27] and at page 56, where the ALJ noted the "composition of the class."

The Court concludes that the evidence supports the conclusion that A.C.'s placement in fourth and fifth grades was appropriate. In those years A.C. was in a small, special education environment, with other students below, at, and above her level of ability. Plaintiff's greater beef, it seems, is with A.C.'s third grade placement – the year she was in a larger class of mixed CSEP and general education students – where indeed that environment may or may not have been appropriate. *Compare Board of Educ. of Frederick County*, 325 F. Supp. 2d at 581 (mainstreaming of student with impulsive and disruptive behavior, limited attention span, and easy distractibility in general education class was not reasonably calculated to provide educational benefit). But as the Court has several times explained, the placement in A.C.'s third-grade year, which was established in her February 9, 2017 IEP, beyond limitations, is not reviewable at this point. *See* Parent Ex. 31 at 23. Without that year in play, most of the wind in Plaintiff's sails goes out and she is left asserting that the small, special education CSEP placement in A.C.'s fourth and fifth grades was somehow inappropriate. However, the evidence is that A.C. began to manifest improvement, particularly in fifth grade. Plaintiff has not shown that the class composition of mixed grades rendered it so inappropriate as to constitute a denial of a FAPE. Though Plaintiff asserts that A.C.'s attention challenges made the mixed classroom settings inappropriate, her personal opinion stands in sharp contrast to, for instance, *Board of Educ. of Frederick County*, 325

---

[27] The ALJ wrote, "Dr. James testified that consideration was given as to whether these changes to the classroom structure had the potential to cause any unintended harmful effects to the Student and the other students in the CSEP program. Dr. James explained the Student continued to receive the same twenty-two hours and thirty minutes of special education services and the IEPs were fully implemented in the third, fourth- and fifth grade…." ALJ Decision at 37.

F. Supp. 2d 565, where the student had severe attention problems and certain IEP services, such as a one-on-one assistant, were actually exacerbating the distractions. There, the ALJ agreed that a non-public placement focused on sensory support and a small class size would be appropriate. This Court sees no evidence from the witnesses credited by the ALJ that there was a detriment in the mixed-grade CSEP classes in A.C.'s fourth and fifth grade years. The Court affirms the ALJ's conclusion with respect to this placement.

### F.  Failure to Implement IEPs

In Count V, Plaintiff argues that the ALJ erred in ruling against her on her claim that PGCPS failed to implement A.C.'s IEPs dated January 31, 2018; March 5, 2018; January 24, 2019, and January 14, 2020 and amendments to the same.  First, she points to the January 2018 IEP and amendments that required that the AC's "Special Education Classroom Instruction will be provided by a Special Education Teacher in a co-taught classroom within the [CSEP] for 22 hours 30 minutes a week . . .". Parent Ex. 34 at 25; Parent Ex. 37 at 26. Plaintiff contends that from March 2018 (the beginning of statutory period) through the end of that school year, A.C. received only 15 hours of specialized instruction per week, and that some of her instruction came from a general education teacher. *See* Tr. 821-826; 781; 2025. Second, Plaintiff says A.C.'s placement in the 2018-2019 school year in a class with only CSEP students (meaning no general education students) also constituted a failure to implement the March 2018 IEP and May 2018 amendment, since the January 2018 EIP specifically provided that A.C. would be in a *mixed* class setting. See FOF 51. Third, Plaintiff contends that the evidence showed that PGCPS failed to implement the IEPs by failing to "provide the Student with sufficient specialized instruction geared toward and designed to enable the Student to achieve her annual IEP goals." In essence, Plaintiff's point appears to be that she has offered evidence that A.C. *can* learn, and, while A.C. made only one

grade level of improvement in reading from third to fifth grade, she made three grade levels of improvement once she started receiving more specialized programing (working with Ms. Bustos) in fifth grade, including the SpellRead program. In support of the proposition that lack of performance shows the IEPs were not implemented, Plaintiff points to *Endrew F. supra*, to the effect that "[a] substantive standard not focused on student progress would do little to remedy the pervasive and tragic academic stagnation [of disabled children] that prompted Congress to act [by enacting IDEA]," and to *K.D. ex rel. J.D. v. Starr*, 55 F. Supp. 3d 782, 792 (D. Md. 2014) ("in a case under IDEA, [] a student's actual educational progress is an important fact in determining whether she has been afforded an educational benefit."). Fourth, Plaintiff argues that evidence from A.C.'s performance while home schooled in sixth grade, showed progression to reading at grade level 4 and grade 2 math, which further demonstrates that whatever PGCPS was offering, it clearly failed to implement the IEPs.

PGCPS answers: The Court should defer to the ALJ's findings with respect to the implementation of the IEPs, wherein she found that Plaintiff had presented no evidence to support her assertion that the IEPs were not implemented. Defendants stress that neither before the ALJ (nor before the Court) has Plaintiff convincingly shown that the factual findings of the ALJ were not regularly made. Instead, they say, Plaintiff falls back once again on the testimony of Dr. Clarke, which the ALJ rejected. Defendants highlight the ALJ's reasoning that Dr. Clarke had never observed A.C. nor her teacher nor that she has any firsthand knowledge of the implementation of the IEPs. Pl.'s Br. 8-9. Thus while Dr. Clarke could provide information as to what she believed may have been the *appropriateness* of the IEP services and goals, her testimony was wholly irrelevant as to their *implementation*. Instead the ALJ relied on the testimony of Dr. James, the coordinator or the CSEP program, who testified that the IEPs were in fact implemented. Dr. James,

for instance, testified that A.C. continued to receive the twenty-two hours and thirty minutes a week of special education services, testimony which the ALJ credited. ALJ at 37; Tr. 1269. Defendants invite attention to the ALJ decision at 38 (emphasis added), "The Parent essentially argued that because in her view the Student was not making progress, PGCPS must not have been implementing the IEPs. These bold assertions, without evidence to support the assumption, are not persuasive." (Emphasis added). Defendants argue that the record fully supports the ALJ's decision to grant their Motion for Judgment as to Count 4. The Court agrees.

Plaintiff's "bold assertions" that the IEP's must not have been implemented, quite simply, cut no ice. She provides no evidence or citations to the record to show, for instance, that A.C. received only fifteen hours of specialized instruction as opposed to twenty-two hours and thirty minutes. Plaintiff seems to have calculated that, because A.C. was in a class that included general education students in third grade, she must have received some hours of non-specialized instruction. The record evidence, however, is to the contrary: A.C. received the special education instruction set forth in the plans. *See* Tr. 821-827; 1269 (Dr. James testifying that A.C. received required hours of special education instruction). The CSEP program, which in its entirety provided special education instruction to A.C., included grade-level curriculum with modifications and accommodations tailored to A.C.'s needs. Moreover, as the Court has already made clear in discussing the appropriateness of the IEPs, the fact that A.C. may not have made expected or desired progress does not necessarily mean the IEPs were not implemented.

The one issue on which Plaintiff is correct is that the March 2018 IEP specifically provided that AC would be in a "co-taught" classroom – i.e., a mix of general education and special education students. That particular IEP was operative until the January 2019 IEP replaced it. Beginning in fall of 2018, however, AC was in an all-special education student class (of mixed

grades). To that extent, then the IEP was, in part, not implemented. That, however, does not automatically equate to the denial of a FAPE.

"[F]ailure to perfectly execute an IEP does not necessarily amount to the denial of a [FAPE]." *Sumter Cty. Sch. Dist. 17 v. Heffernan ex rel. TH*, 642 F.3d 478, 484 (4th Cir. 2011). To be sure, a material failure to implement an IEP or a failure to implement a material portion of an IEP can amount to a violation of the IDEA. *Id.* For instance, the Fourth Circuit has held that failing to provide the hours of therapy required by an IEP did not mean that the school district failed to properly implement a material portion of the IEP and deny the student a FAPE. *Id.* at 485–86. The question that remains is whether the acknowledged failure in this case was material in nature. The Court concludes that it was not.

Though the ALJ did not address this issue head-on, the evidence in the record demonstrates that A.C.'s placement with CSEP-only students from the beginning of the 2018-2019 school year until January 2019 (when the IEP was revised to indicate that A.C. would be in a CSEP-only class) did not constitute a denial of a FAPE. Indeed, the fact that A.C.'s fourth grade class was smaller in size and comprised of special education students only would seem to address Plaintiff's complaints that the third-grade class was too large and too challenging. The smaller CSEP-only classroom was "reasonably calculated to enable" A.C. "to make progress appropriate in light of [her] circumstances." *See Endrew F. ex rel. Joseph F.*, 137 S. Ct. at 999. In sum, there was no denial of a FAPE. *See, e.g., R.F. by and through E.F.*, 919 F.3d at 248 (changing student's placement to include more time in specialized setting outside of general education without revising IEP constituted failure to implement IEP but did not constitute a denial of a FAPE as change was calculated to allow student to make progress).

### G.  Failure to Provide Accurate Progress Reports

In Count VI, Plaintiff alleges that Defendants failed to provide accurate IEP Progress Reports for A.C., disputing the ALJ's conclusion to the contrary. Thus, Plaintiff cites the 2019-2020 and 2018-2019 IEP Progress Reports, which indicated that AC was "making sufficient progress" to meet her goals. These must be inaccurate, Plaintiff suggests, because, once again, A.C. did not ultimately meet most of her goals. In support, Plaintiff cites her own testimony and that of Dr. James and Ms. Bustos regarding, *inter alia*, A.C.'s failure to progress and meet goals. Pl.'s Br. 10-11. Plaintiff also points to *Bd. of Educ. of Frederick Cty. v. I.S. ex rel. Summers*, 325 F. Supp. 2d 565 (D. Md. 2004), where Judge Bennett of this Court considered the fact that the student "achieved none of the three reading goals contained on her [] IEP," *id.* at 583, and concluded that "[b]ecause the record indicates that [the student] made little more than de minimis progress under the [] IEPs during the [] school year, the ALJ correctly gave little weight to FCPS's Quarterly IEP Goals Reports . . . showing that [she] was making sufficient progress toward achieving her IEP goals by the annual review date." *Id.* at 587. Plaintiff believes that, as in Judge Bennett's case, because A.C. achieved only one IEP goal during all three IEP years at issue, the ALJ's finding that the A.C. IEP progress reports showing that A.C. was making sufficient progress toward achieving her IEP goals were accurate cannot be correct, and therefore is entitled to no weight, and constitutes reversible error.

Defendants respond that Plaintiff attempts to undermine the factual conclusions of the ALJ are essentially conjectural and in no way strip the findings of their otherwise *prima facie* correctness. Defendants underscore the ALJ's reasoning that "The Parent misunderstands the meaning of the various progress report terms. Simply because the Student did not accomplish the goal[s] by the end of the IEP period does not mean that they were inaccurate." ALJ Decision at

40. Defendants further argue Plaintiff has in effect manipulated the testimony of Dr. James and Ms. Bustos in support of her point that the IEPs reports must have been flawed because student did not make progress. On the other hand, Dr. James testified the progress noted in the IEP reports were accurate. Tr. 1227-35.

The Court once again rejects Plaintiff's argument that A.C.'s minimal progress necessarily means that IEP reports stating she was making sufficient progress were inaccurate. In Judge Bennett's case, the claim was not that the IEP reports were so inaccurate as to constitute an independent denial of a FAPE.  The ALJ in Judge Bennett's case, in weighing the evidence in that case, apparently found only that the IEP reports were unpersuasive and he therefore discounted the progress as reported in the IEPs. Here the ALJ found no inaccuracy in the IEP reports that stated that A.C. was making "sufficient progress" towards her goals, ultimately concluding that, though A.C. did not meet her goals, the reports were not *inaccurate*.

The Court likewise finds no evidence that the IEP Progress Reports in the present case were inaccurate. No case law holds that, insofar as a student may have failed to progress in several ways, *ipso facto* IEP Progress Reports stating that the student is making "sufficient progress" are inaccurate. There is no basis for finding inaccuracies in the Progress Reports in this case.

### H.  Attorney's Fees

In Count VII, Plaintiff requests the Court award her attorney's fees pursuant to the fee-shifting provision of the IDEA, 20 U.S.C. § 1415(i)(3) (2004). The Court will DEFER action on this request.

The IDEA provides that the "[i]n any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs to the parents of a child with a disability who is the prevailing party." 20 U.S.C. § 1415(i)(3)(B). A litigant is a prevailing party for purposes of an attorney's fees award "if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983).

Plaintiff asserts she is a prevailing party in the instant case because she prevailed before the ALJ on two grounds, namely (a) on her claim that PGCPS denied the A.C. a FAPE by failing to provide appropriate IEPs to the extent that the 2019 IEP did not include speech therapy, and (b) on her claim that PGCPS failed to hold IEP meetings to review and revise A.C.'s IEP to address lack of progress in 2018 and 2019. Accordingly, Plaintiff argues she is entitled to an award of attorneys' fees for apparently all the legal expenses she incurred in the eleven-day administrative hearing of this case.[28]

Defendants do not contest that Plaintiff achieved prevailing party status as to a limited portion of her suit. They argue, however, that Plaintiff should not be awarded the $116,252.50 attorney's fees she seeks, based on an hourly rate of $450.[29]  Moreover, Defendants suggest the issue is premature, inasmuch Plaintiff's fee entitlement will be impacted by how the Court decides the case on appeal.

---

[28] Presumably Plaintiff would also seek fees as "a prevailing party" insofar as the Court might find in her favor as to any issues she prevails on on appeal that she did not prevail on before the ALJ.

[29] Defendants point the Court to a letter in which they proposed to Plaintiff a quantum of relief proportionate to the claims on which Plaintiff prevailed. Ex. 2 to ECF No. 32. Because the letter conveys settlement discussions, the Court will not consider it in connection with any fee award. *See J.D. ex rel. Davis v. Kanawha Cty. Bd. of Educ.*, 571 F.3d 381, 383 (4th Cir. 2009) ("Because the school board's settlement offer explicitly referred to terms from a confidential mediation in violation of 20 U.S.C. § 1415(e)(2)(G), the district court properly refused to consider the settlement offer as evidence.").

As to the latter point, Defendants are correct. "<u>After</u> a district court has determined that a litigant is a prevailing party for purposes of an attorney's fees award, the district court must assess an appropriate fee by calculating the 'number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.'" *Bd. of Educ. of Frederick Cty. v. I.S. ex rel. Summers*, 358 F. Supp. 2d 462, 465 (D. Md. 2005) (emphasis added), *quoting Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S. Ct. 1933, 76 L. Ed. 2d 40 (1983). *See, e.g. Board of Educ. of Frederick County*, 358 F. Supp. 2d at 464 (ruling on motion for attorneys' fees after ruling on cross motions for summary judgment).

The Fourth Circuit has adopted a multi-factor test to determine a reasonable attorney's fee award, often called "Johnson factors." *See A.D. v. AD ex rel. SD v. Bd. of Pub. Educ. of City of Asheville*, 99 F. Supp. 2d 683, 687 (W.D.N.C. 1999) (recognizing that the twelve factor test originally set forth in *Johnson v. Georgia Highway Express, Inc*., 488 F.2d 714, 717–719 (5th Cir.1974) is "well settled law in the Fourth Circuit."); *E.E.O.C. v. Serv. News Co.*, 898 F.2d 958 (4th Cir. 1990). This involves a detailed analysis, of the sort not sufficiently covered in Plaintiff's pending Petition for Fees nor in Defendants' brief. The Court believes that, through subsequent and detailed briefing by the parties, it will be in a better position to make its determination. It is premature to address the issue at this time, absent adequate briefing. Indeed, it would seem appropriate to defer any further briefing or decision on the fee petition until all merits issues are resolved, not only by the Court, but by the Fourth Circuit, in the event an appeal is taken. *See, e.g., JP ex rel. Peterson v. Cty. Sch. Bd. of Hanover Cty., Va.*, 641 F. Supp. 2d 499, 505 (E.D. Va. 2009) (following administrative proceeding, District Court proceeding, appeal to the Fourth Circuit resulting in vacatur and remand, reconsideration, and a second decision on the merits, parents were directed to provide a properly documented application for attorney's fees).

Insofar as Plaintiff's counsel may be requesting that 100 percent of her fees be recovered, however, the Court wishes to make one important point: "When an unsuccessful claim is distinct in all respects from a successful claim, the time spent by the party's attorney on the unsuccessful claim should not be included in an award for reasonable attorney's fees." *I.S. ex. Board of Educ. of Frederick County*, 358 F. Supp. 2d at 466, *citing Hensley*, 461 U.S. at 436. Thus district courts may adjust attorney's fees to the extent that a party is not 100 percent successful at the administrative hearing level. *See id. See also J.D. ex rel. Davis*, 571 F.3d at 387 (District Court did not abuse its discretion in awarding limited attorney's fees that accounted for parent's limited success). The same of course would be true with respect to attorney time spent on the District Court and Court of Appeals proceedings, over and above the time spent at the administrative level.

Accordingly, the Court **DEFERS** Plaintiff's Motion for Summary Judgment without prejudice as to Count VII, her request for attorney's fees. She may renew her request for attorney's fees at the end of the proceedings in this Court or after exhausting her appeal rights, whichever comes later.

## VI.    CONCLUSION

For the foregoing reasons, the findings of fact and conclusions of law of the ALJ are **AFFIRMED** in all but two respects. Plaintiff's Motion for Summary Judgment is **GRANTED IN PART**, specifically with respect to the ALJ's failure to provide a remedy for Defendants' failure to convene IEP meetings for A.C. in April and June of 2018 and their failure to include <u>direct</u> OT services for A.C. in the 2019 IEP. Appropriate remedies will be ordered. The Motion is **DENIED** as to all other Counts. Defendants' Cross Motion for Summary Judgment is correspondingly **DENIED IN PART** based on its failure to convene the IEP meetings for A.C. in April and June

2018 and their failure to include <u>direct</u> OT services for A.C. in the 2019 IEP. Defendants' Motion

is **GRANTED** as to all other Counts.

A separate Order will **ISSUE**.

Date: March 3/, 2022

PETER J. MESSITTE
UNITED STATES DISTRICT JUDGE